UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CARLYLE CHASE,

                Plaintiff,

      - against -

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.
------------------------------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**
11-CV-0012 (RRM)

**ROSLYNN R. MAUSKOPF, United States District Judge.**

       Plaintiff Carlyle Chase ("plaintiff") brings this action against Michael J. Astrue,

Commissioner of the Social Security Administration ("defendant" or "Commissioner"), pursuant

to 42 U.S.C. § 405(g), seeking review of defendant's determination that plaintiff is not entitled to

disability insurance benefits under Title II of the Social Security Act ("SSA").  Plaintiff and

defendant have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c).  (Def.'s Mot. J. Pls. (Doc. No. 15); Pl.'s Mot. J. Pls. (Doc. No. 17).)  For the

reasons set forth below, defendant's motion is DENIED, plaintiff's motion is GRANTED, and

the matter is remanded to the Commissioner for further proceedings consistent with this

Memorandum and Order.  Plaintiff's request for attorney's fees pursuant to the Equal Access to

Justice Act, 28 U.S.C. § 2412, is DENIED without prejudice.

# BACKGROUND

## I.     Plaintiff's Disability Claim

Plaintiff Carlyle Chase was born in Trinidad in 1956.  (Administrative Record ("Admin. R.") (Doc. No. 21) at 121,409.  He completed the 12th grade and came to the United States in 1992.  He is now a naturalized citizen.  (Admin. R. at 34, 138, 409.)

Beginning in March 2003, plaintiff was employed as a bus driver by the Metropolitan Transportation Agency ("MTA").  (*Id*. at 133.)  On January 14, 2006, plaintiff was punched in the right side of the face and head while working.  (*Id*. at 132–33.)  Plaintiff sought treatment in the emergency room of New York Westchester Square Medical Center in Bronx, New York, on the day of the incident.  Records show a discharge diagnosis of "muscle strain."  (*Id*. at 176, 423.)  Plaintiff stopped working as a result of the incident, and received workers' compensation until 2009.

Plaintiff returned to work as an MTA bus driver on January 20, 2009 for eight days.  (*Id*. at 428.)  His return was cut short after sustaining an injury to his neck and back when his bus hit a dip in the road, causing him to jostle up and down from his seat.  (*Id*.)

On June 30, 2007, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning January 14, 2006.  (*Id*. at 11.)  Plaintiff's application was denied on September 28, 2007, and he filed a request for a hearing on November 8, 2007.  (*Id*.)  Plaintiff, represented by legal counsel, testified at a hearing held on March 17, 2009 before Administrative Law Judge Jeffrey M. Jordan ("ALJ Jordan").  (*Id*.)  ALJ Jordan denied plaintiff's claim in a decision dated May 18, 2009.  (*Id*. at 26.)  Plaintiff's former counsel filed exceptions to the May 18, 2009 decision on February 11, 2010.  (Pl. Br. at 15 (Doc. No. 18); Admin. R. at 163–74.)  On November 4, 2010, ALJ Jordan's decision became the final

decision of the Commissioner of Social Security, when the Appeals Council denied plaintiff's request for review and upheld ALJ Jordan's decision.  (*Id*. at 1–5.)  Plaintiff filed this action on January 3, 2011, alleging that the decision of ALJ Jordan was not supported by substantial evidence and is contrary to the law and provisions of the Social Security Act.  (Compl. (Doc. 1).)

## II.    The Medical Evidence

From the date of the 2006 incident to the date of the denial of disability benefits, plaintiff was treated or examined by a number of physicians whose records are part of the administrative record.  For his spinal and shoulder conditions, plaintiff was treated by Dr. Michael Hearns, followed by Dr. Modesto Fontanez, and then Dr. Matthew Clarke.  He was treated by psychologist Dr. Robert Lancer, psychiatrist Dr. Jeffrey Brown and neuropsychologist Dr. Kim Busichio, and neurologist Dr. Aric Hausknecht.  He also saw several doctors for one-time assessments.  Dr. Jason Brown conducted a neurobehavioral screen.  State agency psychiatrist Dr. G. Minola completed a psychiatric review and mental residual functioning capacity assessment.  Dr. Kevin Wang performed a single orthopedic examination.  The findings and observations of these medical professionals are summarized below.

### a.  Dr. Michael Hearns

On January 19, 2006, plaintiff, complaining of pain to his face, neck, jaw, shoulder and ear, saw Dr. Michael Hearns of Central Medical Services of Westrock.  (*Id*. at 221–23, 296, 432–34.)  Dr. Hearns completed a New York State worker's compensation "Attending Doctor's Report."  (*Id*.)  Dr. Hearns' diagnosis was assault, cervical disc displacement, internal derangement of the shoulder, and lumbar disc displacement.  (*Id*.)  Planned future treatment included physical therapy, medication, and a referral to psychiatric care.  (*Id*.)  In response to the question whether the plaintiff's injury may "result in permanent restriction [or] total or partial

3

loss of function," Dr. Hearns indicated, "Yes." (*Id*.) In response to the question whether patient is "disabled from regular duties or work," Dr. Hearns indicated, "total." (*Id*.) In response to the question whether patient can "do any work," Dr. Hearns indicated, "No." (*Id*.)

Records reflect that plaintiff was treated by Dr. Hearns approximately once per month between the date of the incident to the end of August 2007, with increasing frequency in June and July of 2007. (*Id*. at 210–32, 285–95, 297–99, 305, 311, 367–87, 399, 403–07, 415, 430, 435.) In addition to his progress notes, Dr. Hearns completed additional workers compensation reports on approximately a dozen occasions wherein he repeatedly ordered MRIs and other diagnostic testing, and indicated that plaintiff should continue with therapy and continue with psychological treatment. (*Id*. at 210, 212–13, 226, 232, 252, 283–84, 367, 369, 371, 373, 375, 380, 382, 385, 387, 400, 404, 406, 431, 436.) In those reports, he consistently indicated that plaintiff was unable to perform regular duties or work, that his impairment was "total," and that he could not do any type of work. (*Id*.)

Over the course of plaintiff's treatment, Dr. Hearns ordered several diagnostic tests. A March 16, 2006, cervical spine MRI revealed slight anterior osteophyte formation at C4-5 and C5-6. (*Id*. at 193, 208, 365.) Further impressions included degenerative changes and narrowing of both neural foramina bilaterally at C4-5 and C5-6. (*Id*.) Diagnostic tests performed on April 20, 2006—including Sensory and Motor NCS, F Wave, and Needle Electromyography ("EMG")—produced findings "consistent with right C5 Radiculopathy." (*Id*. at 195–200, 355–59.) An April 4, 2007 MRI of the lumbar spine showed bulging discs at L1-2, L2-3, L3-4, L4-5, and L5-S1, and slight spinal stenosis. (*Id*. at 194, 209, 366.) Additional diagnostic tests performed on April 5, 2007 produced results consistent with right S1 radiculopathy and

suggested bilateral medial plantar sensory neuropathy as well as potential proximal neuropathic pathology. (*Id.* at 201–04, 300–03, 361–64.)

Plaintiff continued to complain of neck and back pain throughout 2006 and 2007. (*Id.* at 210, 213–20, 224, 228–31, 265–71, 297, 304–09.)

### b. Dr. Robert Lancer

Rob Lancer, Psy.D., a psychologist in behavioral medicine, treated plaintiff weekly beginning on January 19, 2006. (*Id.* at 242.) On August 10, 2007, he completed a New York State Office of Temporary and Disability Assistance Division of Disability Determinations questionnaire, wherein he described his treatment history with plaintiff. (*Id.* at 242–48.) Dr. Lancer's "treating diagnosis" of plaintiff was adjustment disorder with anxiety and depressed mood as well as a pain disorder associated with general medical condition. (*Id.*) Dr. Lancer reported plaintiff's mood and affect to be poor; his attitude, appearance, behavior, speech, thought, perception, insight, judgment, and memory were fair. (*Id.* at 245.) He noted that plaintiff had fatigue, memory loss, depression, and back pain which impinged upon his daily functioning. (*Id.* at 246.) Plaintiff was noted to have difficulty focusing on one task and was limited socially due to depression and a fear of crowds. (*Id.* at 247.) The doctor indicated that plaintiff's ability to do work-related mental activities was limited in every enumerated area. (*Id.*) However, he indicated he could not provide a medical opinion regarding the plaintiff's ability to do other work-related activities. (*Id.* at 248.)

### c. Dr. Jeffrey A. Brown

Jeffrey A. Brown, M.D., a psychiatrist, completed a similar questionnaire on July 31, 2007. (*Id.* at 235–41.) Dr. Jeffrey Brown wrote that he had been treating plaintiff weekly since June 10, 2006, for PTSD, cognitive disorder, and major depressive disorder with psychotic features, among other diagnoses. (*Id.* at 235.) Symptoms included depression, poor short-term

memory and decreased concentration, nightmares, flashbacks, paranoia, and severe lower back and neck pain.  (*Id*.)  For the most recent mental status examination, plaintiff was fully oriented, and had fair insight and judgment.  (*Id*. at 238)  The doctor found plaintiff's ability to perform calculations was poor.  (*Id*.)  Although plaintiff's prescribed medication blunted his impulsivity, the doctor's records indicated ongoing problems with memory and concentration.  (*Id*. at 239.)  With respect to plaintiff's ability to function in a work setting, Dr. Jeffrey Brown opined that plaintiff was very paranoid, could not relate to others, and was limited in taking public transportation or driving due to fear symptoms resulting from his assault.  (*Id*. at 240.)  The doctor indicated that plaintiff's ability to do work-related mental activities was limited in every enumerated area.  (*Id.*)

### d.  Drs. Jason Brown and Kim Busichio

Psychiatrist Jason Brown, M.D. and neuropsychologist Kim Busichio, Ph.D., conducted a "Neurobehavioral Screen" on April 9 and 10, 2007.  (*Id*. at 408–12.)  Plaintiff was referred to Dr. Brown "for a neuropsychological evaluation due to problems with attention and memory."  (*Id*. at 408.)  Plaintiff reported back and wrist pain, headaches, dizziness, vision problems, sleep disturbance, in addition to symptoms of depression and post traumatic stress disorder."  (*Id*.)  Plaintiff was alert and oriented during examination.  (*Id*. at 409.)  Testing revealed all of plaintiff's cognitive functioning to be in the borderline to low average range except for "information processing speed," which was in the impaired range.  (*Id*. at 411.)  The diagnostic impression included: post-concussion syndrome; neuropsychological impairment secondary to cerebral dysfunction, which was consistent with the reported head injury; post-traumatic stress disorder ("PTSD") and major depressive disorder.  (*Id*. at 410.)

### e. Dr. Aric Hausknecht

Dr. Aric Hausknecht performed his first neurological assessment of plaintiff on May 7, 2007, the results of which were memorialized in a memorandum to Dr. Brown dated May 10, 2007. (*Id*. at 189–92, 416–19.) Dr. Hausknecht reported that plaintiff was experiencing daily headaches, feeling dizzy, having trouble concentrating, feeling depressed, having trouble sleeping, recurrent thoughts, neck and back pain, as well as pain and numbness radiating to his right leg and hand. Plaintiff reported problems with daily living, sitting, bending, lifting, and driving. A neurological examination found plaintiff's mood to be anxious, with immediate recall and long-term memory intact, but short-term memory impaired. (*Id*. at 190, 417.) Dr. Hausknecht also found cervical and lumbosacral paravertebral tenderness and associated muscle spasm. His records reflect his "impression" to be: "Closed head trauma with post concussion syndrome and traumatic brain injury. Cervical and lumbosacral derangement." (*Id*. at 191, 418.) The doctor advised plaintiff to continue with physical and psychotherapy and to take his medications as directed. (*Id*. at 192, 419.) Further, Dr. Hausknecht opined that plaintiff was totally disabled, and he advised plaintiff to restrict his activities. (*Id*.) Dr. Hausknecht ordered diagnostic testing performed on May 7, 2007 to assess vestibular and auditory signs and symptoms, which resulted in normal findings. (*Id*. at 205 (Brainstem Auditory Evoked Potential Report).)

Notes from office visits on June 5, 2007 and July 23, 2007 reflect that plaintiff's mood continued to be anxious, memory continued to be impaired, and his cervical pain and spasm continued, among other things. (*Id*. at 187–88.) Dr. Hausknecht also referenced results from a March 16, 2006 MRI showing narrowing in some locations and bulging and herniation in others. As of July 23, 2007, prognosis was "poor", and disability was indicated to be "total." (*Id*. at 187.)

7

### f. Dr. John Shimkus

In a report dated June 12, 2007, Dr. John Shimkus related that plaintiff's diagnoses were posttraumatic stress, internal derangement, herniation, nucleus pulposus neck and herniation, nucleus pulposus back. He indicated that plaintiff had temporary total disability and was unable to perform regular work. (*Id.* at 253.)

### g. Dr. G. Minola

Medical consultant and state agency psychiatrist G. Minola, M.D., completed a psychiatric review technique form and mental residual functioning capacity assessment of plaintiff on September 13, 2007. (*Id.* at 317–33.) Dr. Minola indicated that plaintiff suffered from "adjust disorder." (*Id.* at 320.) Dr. Minola found that plaintiff's affective disorder did not satisfy Section 12.04 of the Listing of Impairments. (*Id.* at 320.) Dr. Minola did not address any other possible listed impairment. (*Id.* at 317–30.) The doctor indicated that plaintiff suffered from moderately limited abilities in understanding and memory, as well as sustained concentration and persistence. In the concluding remarks section, Dr. Minola opined that the review

> [D]oes not indicate significant psychopathology adls [sic] and social activity are adequate. [Plaintiff] appears to be able to understand[,] remember[,] & carry out simple tasks in a low stress environment & to relate to peers & supervisors in a work setting cl. Make exaggerated statements about adls [sic] since he continues to drive a car and claims that he cannpoyt [sic] remember anything after 5 minutes even thoug [sic] ther [sic] is no evidence of cognt. imp.

(*Id.* at 333.)

### h. Dr. Kevin Wang

Consultative examiner Kevin Wang, M.D. performed an orthopedic examination of plaintiff on September 19, 2007. (*Id.* at 343–46.) Plaintiff informed Dr. Wang that he was experiencing low back and cervical neck pain, with radiation into his right arm and hand as well

as down his right leg and foot, which was made worse by walking more than five minutes or sitting for more than ten minutes or lifting his right arm. (*Id*. at 343.) Plaintiff reported to Dr. Wang that he cooked twice a week, and bathed and dressed himself two times a day. (*Id*.) Plaintiff was reported to enjoy "watching television, listening to [the] radio, reading, going out to the park and doctor and physical therapy appointments." (*Id*.) An examination of the thoracic and lumbar spine produced pain. (*Id*. at 345.) Based on the day's examination, Dr. Wang concluded that plaintiff had "mild limitations for squatting, bending, kneeling, lifting. No limitations for sitting, standing, walking, reaching, or use of bilateral upper extremities for fine or gross motor activities." (*Id*.)

### i. Dr. Modesto Fontanez

A progress note prepared by Dr. Modesto Fontanez on October 4, 2007 indicated that plaintiff's diagnosis was cervical spine injury, traumatic fibromyositis with osteophytic discs, lumbar strain with bulging discs, and PTSD. (*Id*. at 391.) Plaintiff saw the doctor again on November 14, 2007, May 6, 2008, September 9, 2008, and October 21, 2008. (*Id.* at 390–97, 401.) A progress note prepared on September 9, 2008 indicated that plaintiff "continues to demonstrate hyperesthesia over the right C5-C6 dermatone distribution and has marked spasm of the right cervical paravertebral muscles with restricted range of motion on the cervical spine." (*Id.* at 388.) The assessment was "disc herniation of C4-C5, C5-C6 with right C5-C6 radiculopathy, and the disability was "temporary total disability." (*Id.* at 388–89.) However, plaintiff's symptoms were improved after receiving a cervical epidural block from a Dr. Freeman. (*Id.* at 393, 401.)

### j. Dr. Matthew Clarke

On December 10, 2008, plaintiff reported to Dr. Matthew Clarke that his back and shoulder pain were "ok," although he continued to complain of neck pain following epidural

injections. (*Id*. at 397.) Plaintiff also informed the doctor that his PTSD symptoms had improved and that he was "ready to work." (*Id*. at 397.) Dr. Clarke concluded that plaintiff's right shoulder pain and PTSD were resolved although he did assess a temporary partial disability due to cervical herniation. (*Id*. at 397–98.)

As noted above, plaintiff returned to work as an MTA bus driver on January 20, 2009 but sustained another injury to his neck and back when his bus hit a dip in the road. On examination following this incident, Dr. Clarke found "marked tenderness and muscle spasms on palpitation of the trapezius muscle more on the right side." (*Id*. at 429.) Cervical range of motion was limited to 90 degrees in all directions. (*Id*.) Dr. Clarke diagnosed aggravation of a cervical herniated disc, aggravation of cervical radiculopathy, and aggravation of a lumbar sprain, while ruling out a lumbar herniated disc. (*Id*.) He concluded that plaintiff was temporarily totally disabled from work, finding that the new injury resulted in aggravation of his cervical herniated disc and radiculopathy, and may have resulted in a lumbar herniated disc. (*Id*.)

Plaintiff had similar results in February 18 and March 4, 2009 exams. (*Id*. at 424–27.) Additionally, during the March exam, Dr. Clarke referred plaintiff to psychiatrist Dr. Brown due to concerns regarding his mental health. (*Id*. at 425.)

### III.  Hearing Testimony

#### a.  Plaintiff

Plaintiff testified that in an eight-hour workday he could sit for about eight minutes without becoming uncomfortable and needing to stand, could stand for ten minutes before needing to hold onto something for support, and could walk for about five minutes. (*Id*. at 39–40.) Plaintiff testified that he could lift "[m]aybe about a pound or two." (*Id*. at 41.)

Plaintiff further testified that his daily activities included reading, walking outside and watching television. (*Id.* at 41.) Plaintiff also testified that he frequently slept during the day. (*Id.*) Finally, plaintiff claimed that he had post-traumatic stress disorder (PTSD) from injuries he sustained on January 14, 2006. (*Id.* 43.) When asked if he still had PTSD symptoms, plaintiff replied that "[s]ometime I still got something." (*Id.*)

### b. Dr. Gerald Winkler

Gerald Winkler, M.D., a neurologist, testified as a medical expert at plaintiff's March 2009 hearing. (*Id.* at 49–53.) Dr. Winkler based his testimony on MRI results from March of 2006, an EMG of April 2007, an electrodiagnostic study in May of 2007, and the results of Dr. Wang's one-time, consultative examination. (*Id.* at 49.) Dr. Winkler had not received or reviewed any of the other medical records summarized above. (*Id.* at 49–50, 21.) Upon reviewing the medical records available to him at the time of the hearing, Dr. Winkler stated that plaintiff's lumbar spinal disorder did not satisfy the criteria for disorders of the spine in the Listing of Impairments because of the absence of evidence of reflex or sensory loss, although the findings were "consistent with some degree of pain in the back or lower back." (*Id.* at 50–51.) Dr. Winkler also noted that there was evidence of mood disturbance, but not to the severity required to fulfill Listing 12.04. (*Id.* at 51.) He concluded his testimony by estimating that plaintiff could lift 10 pounds frequently and 20 pounds occasionally, that he could not perform repeated bending or twisting, and that he could not climb ladders. (*Id.* at 51.) Further, Dr. Winkler testified that "it would be preferable [for plaintiff] to have a job that did not require close and frequent contact with the public, or close and frequent interaction with fellow employees." (*Id.*)

Following the hearing, Dr. Winkler received additional medical documents. He reported that the records from "CMSW" (presumably records from Dr. Hearns) were illegible, and that

the records indicating injury were based on plaintiff's subjective responses, and thus the evidence would not change his testimony. (*Id*. at 21, 109–11, 443.)

### c. Vocational Expert Donald Slive

Vocational Expert Donald Slive also testified at the hearing that given the plaintiff's age, education, work experience, and residual functional capacity—as characterized in a hypothetical to Mr. Slive—there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (*Id*. at 53–56.)

## STANDARD OF REIVEW

### I. Review of a Denial of Social Security Benefits

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether the claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, (1938)). Where the Commissioner makes a legal error, a "court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted). An ALJ's failure to apply the correct legal standards is grounds for reversal. *See Townley*, 748 F.2d at 112 (citation omitted).

## II.      Eligibility for Disability Benefits

A person is considered disabled for Social Security benefits purposes when he is unable

"to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *see, e.g.*, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended on other

grounds*, 416 F.3d 101 (2d Cir. 2005).  An individual shall be determined to be under a disability

only if his physical or mental impairment or impairments are of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy.  42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see, e.g.*, *Butts*, 388 F.3d at 383.

In determining whether an individual is disabled for disability benefit purposes, the

Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions

based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience." *Mongeur v.

Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Social Security Administration's regulations require a five-step analysis for

determining whether a claimant is disabled:

[1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

[2] If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the

Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

### I.    ALJ Jordan's Decision

ALJ Jordan engaged in the required five-step analysis.  At the first step, ALJ Jordan found that plaintiff did not engage in substantial gainful activity since the time of his alleged onset date of January 14, 2006.  (Admin. R. at 13.)  At step two, ALJ Jordan found that plaintiff was severely impaired by the following ailments: disorder of the back, cervical radiculopathy, bilateral medial plantar sensory neuropathy, post-concussion syndrome, cognitive disorder, PTSD, and depressive disorder.  (*Id.*)  At step three, ALJ Jordan found that these impairments did not meet or qualify as the medical equivalent of any of the listed impairments in Appendix 1 of the regulations.  (*Id.* at 14.)  ALJ Jordan then assessed plaintiff's residual functional capacity ("RFC"), which must be based on all relevant medical and other evidence in the record.  *See* 20 C.F.R. § 404.1520(e).  ALJ Jordan determined that plaintiff had the RFC to perform less than a full range of light work as defined in 20 CFR 404.1567(b).  (*Id.* at 15.)  At the fourth step, ALJ Jordan found that plaintiff was unable to perform any past relevant work.  (*Id.* at 24.)  At the fifth step, ALJ Jordan determined that there existed a significant number of jobs in the national economy that plaintiff can perform within the range of "light work."  (*Id.* at 25.)  Accordingly,

ALJ Jordan found that plaintiff was not disabled for purposes of the SSA and was thus ineligible

for benefits. (*Id.*)

> The ALJ finds that the claimant has the residual functional capacity to perform
> less than a full range of light work as defined in 20 CFR 404.1567(b). The
> residual functional capacity assessment is supported by findings from treating and
> examining sources, including Dr. Hausknecht, Dr. Modesto Fontanez, and Dr.
> Wang, the medical expert's testimony, and the claimant's good activities and
> functional capabilities. He must avoid overhead lifting/carrying, climbing, and
> balancing but he retains the ability to perform other postural movements
> occasionally. He is limited to routine low stress tasks that do not involve close
> and frequent contact with the public or with fellow employees.

(Admin. R. at 15.)

## II.     Plaintiff's Challenge to the ALJ's Decision

Plaintiff appeals the ultimate finding of ALJ Jordan that claimant has not been under a

disability, as defined in the Social Security Act, from January 14, 2006, through the date of ALJ

Jordan's decision. Although plaintiff does not particularize his challenge to a given stage of the

five-step ALJ disability determination process, his arguments appear directed at ALJ Jordan's

finding regarding the plaintiff's residual functional capacity:[1]

Plaintiff argues that ALJ Jordan did not properly apply the treating physician's rule, thus

assigning insufficient weight to the opinions of his treating physicians. Plaintiff also asserts that

ALJ Jordan did not properly evaluate his credibility in assigning weight to his testimony. The

Court finds that ALJ Jordan's legal analysis was insufficient with respect to both issues.

### a.     Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in

20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. The

---

[1] The Court does not read plaintiff's arguments to challenge the ALJ's finding regarding the listed impairment
determination. Plaintiff must carry the burden at this step, *see* 20 CFR 404.1520, but has not directed the Court to
any specific findings regarding this determination. Therefore, this Court's review will focus on the residual
functional capacity determination.

Commissioner's "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). The regulations provide that: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134. "Treating source" is defined as a claimant's "physician, psychologist or other acceptable medical source" who provides, or has provided, the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

When controlling weight is not given to a treating physician's opinion, because it is not "well supported" by other medical evidence, the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d) (2)–(6); *see Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134.

As is the case generally in performing its duties, in applying the treating physician's rule, an ALJ is obligated to develop the relevant record. This well-established Second Circuit rule has been explained thus:

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*,

562 F.3d 503, 508–09 (2d Cir. 2009) (internal quotation marks and brackets omitted); *accord Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see also Gold v. Sec'y of Health Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972) (*pro se* claimant). Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." *Butts*, 388 F.3d at 386 (internal quotation marks omitted). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* (internal quotation marks omitted); *accord Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

*Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009); *see also, e.g.*, 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416912(d), 416.912(e)(2).

Furthermore, the ALJ has a duty to explain his analysis and conclusions with respect to the treating physician's rule. When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ] of the existence of [the treating physician's] favorable . . . report and, if the [ALJ] does not credit the findings of that report, to an explanation of why it does not." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *see Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); *Polidoro v. Apfel*, No. 98 Civ. 2071 (RPP), 1999 WL 203350, at *7 (S.D.N.Y. Apr. 12, 1999) ("The ALJ's failure to . . . set for the reasons for his conclusions with sufficient specificity hinders the ability of a reviewing court to decide whether his determination is supported by substantial evidence.") (citation omitted).

Here, ALJ Jordan assigned little weight to opinions regarding plaintiff's physical condition that were provided by plaintiff's treating physicians, all of whom indicated that plaintiff was totally disabled. (*See, e.g.*, Admin. R. at 192 (Dr. Hausknecht), 210 (Dr. Hearns),

253 (Dr. Shimkus), 388 (Dr. Fontanez).) ALJ Jordan also gave little weight to the opinions regarding plaintiff's mental condition that were provided by plaintiff's treating physicians, all of whom indicated that plaintiff's ability to do work-related mental activities was limited. (*See id*. at 240 (Dr. Jeffrey Brown), 247 (Dr. Lancer).)[2]

ALJ Jordan's explanations for assigning little if any weight to the findings of plaintiff's treating physicians varied little from physician to physician, and essentially rested on one or more of the following reasons: a finding of "disability" goes to the ultimate issue, the finding is not supported by the physician's findings and other evidence, or the finding appears to be based on plaintiff's subjective complaints. (*See, e.g.*, *id.* at 23 (Dr. Hausknecht's opinion "goes to the ultimate issue, is not supported by his findings and other evidence, and it appears to be based on the claimant's unsubstantiated subjective complaints of daily headaches and pain."); *id.* (Dr. Jeffrey Brown's opinion "is not supported by findings on mental status examination and is inconsistent with other evidence of record, which indicates the claimant could do simple routine low stress tasks with limited general public contact."); *id.* (Dr. Shimkus's opinion "is not supported by findings on physical examination.").)[3] Curiously, ALJ Jordan says that his ultimate capacity assessment is supported by the findings of Dr. Hausknecht—whose opinion ALJ Jordan assigned little weight—and Dr. Fontanez, both of whom indicated that plaintiff was totally disabled. (*Id.* at 23–24.)

ALJ Jordan appears to have interpreted the "findings" of these physicians differently than the physicians themselves. This conclusion dovetails with the brief explanation for the weight

---

[2] Dr. Jason Brown performed a one-time screen and did not opine on plaintiff's capacity to perform work-related mental activities. (*See* Admin. R. at 408–12.)

[3] Regarding Dr. Lancer's opinion, the ALJ characterized his findings, saying "Dr. Lancer stated he could not provide a medical opinion regarding the claimant's ability to do work-related activities." (Admin. R. at 23.) This is unsurprising, as Dr. Lancer is a psychologist and is only qualified to comment on (and did comment on) plaintiff's psychological, *i.e.* mental, abilities. With respect to plaintiff's ability to do work-related mental activities, Dr. Lancer indicated plaintiff's abilities were limited in every enumerated area. (*Id.* at 247.)

given to several of the other physician's opinions, which ALJ Jordan found to be "not supported by [the physician's] findings and other evidence." It is true that a finding of "disability" is reserved to the ALJ, not a treating physician. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) ("A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant] is disabled."); *Snell*, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). However, while "[r]eserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, [] it does not exempt administrative decisionmakers from their obligation, under *Schaal* [, 134 F.3d at 505] and § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." *Id.* at 134.

ALJ Jordan did assign significant weight to the opinions of Dr. Wang—who examined the plaintiff once—and Dr. Winkler—who did not examine the plaintiff but reviewed the evidence of the treating physicians (though he found some records "illegible")—saying their opinions were "consistent with the evidence of record." (Admin. R. at 24.) An ALJ is entitled to rely on opinions of both examining and non-examining medical consultants, *see Goff*, 2012 WL 1605574, at *7 (regulations and cases cited), and to "choose between properly submitted medical opinions," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quotation omitted). However, given that ALJ Jordan assigned little weight to the findings of the treating physicians, it is unclear what "evidence of record" ALJ Jordan is referring to, that he apparently believes to be worthy of weight and consistent with the opinions of Drs. Wang and Winkler. [4]

---

[4] A clue to these conclusions may be found in the ALJ's emphasis on the findings (earlier in the opinion) of several physicians of intact motor strength of the extremities, lack of atrophy or sensory deficits, and acceptable muscle tone, which the ALJ contrasts with the plaintiff's claims of pain. (Admin. R. at 23.) However, the findings of the physicians as to plaintiff's disability appear to rest on an entirely different theory of physical impairment—cervical

ALJ Jordan's legal analysis is inadequate. An ALJ may not reject treating physicians' opinions "solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings," *Balsamo*, 142 F.3d at 80, nor is a single sentence indicating that the opinion was contradicted by other evidence in the record sufficient to satisfy his duty, *see Goff v. Astrue*, No. 09-CV-1392 (VEB), 2012 WL 1605574, at *5 (N.D.N.Y. May, 8, 2012). Here, ALJ Jordan did not mention the treating physician's rule, and did not consider many of the factors required to be considered. This legal error is sufficient basis for remand. *See, e.g.*, *Gallagher v. Astrue*, No. 10 Civ. 8338 (LTS)(AJP), 2012 WL 987505, at *20 (S.D.N.Y. Mar. 22, 2012); *Ricks v. Astrue*, No. 10-CV-5236 (JS), 2012 WL 294415, at 8–9 (E.D.N.Y. 2012); *Hach v. Astrue*, No. 07-CV-2517, 2010 WL 1169926, at *11 (E.D.N.Y. Mar. 23, 2010); *Lopez v. Barnhart*, 05 Civ. 10635, 2008 WL 1859563 at *12 (S.D.N.Y. Apr. 23, 2008); *see also, e.g.*, *Schaal*, 134 F.3d at 504 (ALJ committed legal error by failing to "consider all of the factors cited in the regulations").

Moreover, ALJ Jordan was obligated to re-contact the treating physicians before disregarding their assessments. *See Colegrove v. Comm'r of Soc. Sec.*, 399 F. Supp. 2d 185, 196 (W.D.N.Y. 2005); *see also* 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."). Failure to re-contact is error. *See Goff*, 2012 WL 1605574, at *6; *Taylor v. Astrue*, No. CV–07–3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) (finding it error for the ALJ to not re-contact plaintiff's treating physician when he determined that the physician's opinion was "not well-supported by objective medical evidence").

---

displacement, derangement, radiculopathy, etc. There is no explanation by any qualified medical expert in the record that these conditions are inconsistent with pain or inconsistent with intact motor strength or lack of atrophy. The suggestion appears to be born of the ALJ's own musing, contrary to the purpose of the treating physician's rule. *See generally*, *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

ALJ Jordan's RFC assessment may very well be correct. However, the crucial factors going to his determination must be set forth with additional specificity to enable this Court to decide whether the determination is supported by substantial evidence.

### b. Credibility Determination

Plaintiff also argues that his testimony regarding his symptoms was given insufficient weight. Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the functional capacity of a claimant. *See Ber v. Celebrezze*, 332 F.2d 293, 298–99 (2d Cir. 1994); *Goff v. Astrue*, No. 09-CV-1392 (VEB), 2012 WL 1605574, at *7 (N.D.N.Y. May, 8, 2012). "[S]ymptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that . . . [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). To that end, the Commissioner has established a two-step inquiry to evaluate a claimant's contentions of pain. *See* Social Security Ruling 96-7P, 1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c). First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the pain alleged. 20 C.F.R. § 404.1529(c)(1); *see* SSR 96-7P. Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. *See* C.F.R. § 404.1529(c)(3)(i)–(vii).

The credibility inquiry implicates seven factors to be considered, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the

claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. *Id*.

Here, ALJ Jordan applied the two-step inquiry and found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible "to the extent they are inconsistent with the above residual functional capacity assessment." (Admin. R. at 22–23.) ALJ Jordan stated that plaintiff's allegations are not consistent with: "the medical evidence from the treating sources as well as the findings of Dr. Wang, the consultative examiner, and the testimony of the medical expert." (*Id*. at 23.) Further, ALJ Jordan found that claimant's allegations regarding mental limitations are "contradicted by the mental status findings of Dr. Hausknecht and Dr. Clarke, the testimony of Dr. Winkler and the claimant's activities and are not credible to the extent alleged." (*Id*.)

ALJ Jordan relies on the alleged symptoms being "not consistent" with the medical evidence, but does not explain how they are inconsistent and does not identify the specific medical evidence that is inconsistent with the allegations. Furthermore, after finding that the allegations are not substantiated by the objective medical evidence, ALJ Jordan's credibility analysis was insufficient. ALJ Jordan neither explicitly referred to the factors listed in 20 C.F.R. § 404.1529(c)(3), nor discussed any of them beyond listing some of plaintiff's daily activities.[5]

*See Grosse v. Comm'r of Soc. Sec.*, No. 08-CV-4137 (NGG), 2011 WL 128565, at *5 (E.D.N.Y.

---

[5] The Court notes that many of the daily activities listed by the ALJ are "mundane tasks of life," which "do not indicate that he is able to perform a full day of sedentary work." *Martin v. Astrue*, 07-CV-3911 (LAP) (RLE), 2009 WL 2356118, at *12 (S.D.N.Y. Jul. 30, 2009) (citing *Balsamo*, 142 F.3d at 81 (claimant who sometimes drives a car, attends church, and helps wife with shopping may still be unable to perform sedentary work)); *see also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) ("a claimant need not be an invalid to be found disabled"). On remand, the ALJ should make a proper credibility determination in light of this principle, and make clear how the nature and extent of Plaintiff's routine daily activities undermines the credibility of his statements about his symptoms. *Martin*, 2009 WL 2356118, at *12.

Jan. 14, 2011) (finding that ALJ "committed legal error" because he failed to consider any of the credibility determination factors except the claimant's daily activities). Nor did ALJ Jordan "identify what facts he found to be significant, [or] indicate how he balanced the various factors." *Simone v. Astrue*, No. 08-CV-4884 (CPS), 2009 UWL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009). This lack of clarity and failure to meet SSA requirements for evaluating the credibility of plaintiff's subjective complaints requires remand. *See Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) ("[W]here credibility determinations and inference drawing is required of the ALJ . . . [the court should] not hesitate to remand the case for further findings or a clearer explanation for the decision." (citations omitted)).

### c. Remand and Attorney Fees

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" *Butts*, 388 F.3d at 385 (quoting 42 U.S.C. § 405(g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue*, No. 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386). Given the deficiencies outlined above, the decision is reversed and remanded for further proceedings consistent with this opinion.

Plaintiff has requested attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, which provides that:

> [A] court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs . . . incurred by that party in . . . proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). Subsection (B) provides that an application must be filed, within thirty (30) days of final judgment in the action, that shows that the plaintiff is entitled to an award and the amount to which he is entitled. Plaintiff's request for such an award in its notice of motion is insufficient. If plaintiff intends to make an appropriate application, he may do so within the time specified by the regulation, and in accordance with its other specifications.

## CONCLUSION

For the reasons herein, defendant's motion for judgment on the pleadings is DENIED, and plaintiff's motion for judgment on the pleadings is GRANTED, and the matter is remanded to the Commissioner of Social Security for further proceedings consistent with this opinion. Plaintiff's request for attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, is DENIED without prejudice.

The Clerk of Court is respectfully directed to enter judgment accordingly, and close this case.

SO ORDERED.

Dated: Brooklyn, New York
     June 28, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge